MOBLO *v.* CITY OF LANSING.

1. MUNICIPAL CORPORATIONS—DEFECTIVE CROSS WALK—ACTUAL OR CONSTRUCTIVE NOTICE NECESSARY.

    There may be no recovery for damages caused by an unsafe condition of a cross walk unless the municipality had actual or constructive notice of the condition.

2. SAME—CITY NOT CHARGEABLE WITH CONSTRUCTIVE NOTICE.

    In view of the inconspicuous character of a defect caused by a nail or spike projecting through a plank which had been placed for a temporary cross walk, there was not a sufficient lapse of time to charge the city with constructive notice thereof, where it had been so placed after cement, which had been put in not more than 48 hours before, had partially hardened, and therefore where the city had no actual notice there was no liability for personal injuries caused thereby.

3. SAME—DEFECTIVE MATERIALS IN CONSTRUCTION OF CROSS WALK —SUFFICIENCY OF PROOF—DIRECTED VERDICT.

    In an action against a city for personal injuries, on the theory that, in using a plank with a nail or spike projecting through, improper materials were used in constructing a temporary cross walk, it was incumbent upon the plaintiff to establish the fact that the city or some of its agents or employees had so used the plank rather than that it had been placed there by employees of the street railway company as a means of getting passengers across newly laid cement, and where said fact was not established the trial court properly directed a verdict in favor of defendant.

Error to Ingham; Carr (Leland W.), J. Submitted April 10, 1928. (Docket No. 92, Calendar No. 33,597.) Decided July 24, 1928.

Case by Anna Moblo against the city of Lansing for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

243—Mich.—30.

*Frank L. Dodge* and *James A. Greene,* for appellant.

*J. E. Converse,* City Attorney, for appellee.

NORTH, J.     Washington avenue extends in a northerly and southerly direction in the city of Lansing, and in the summer of 1925 the city was engaged in constructing an asphalt pavement with a concrete base on this thoroughfare.     A street railway having a double line of tracks is operated thereon.     On the 12th of August, 1925, the work of constructing the concrete base had extended some distance northerly of the intersection of Washington avenue and Ionia street.     There was an excavation of considerable depth between the tracks of the street railway, and railway ties had been laid therein so that it was possible for pedestrians to pass over the tracks at a point in line with the northerly sidewalk on Ionia street. From these ties on the westerly side of the tracks to the westerly curb of Washington avenue planks were laid down either as a temporary cross walk or as an approach to the point where the street cars stopped for passengers.     There is evidence in the record tending to show that these planks were of the same type that had been used by the city in making forms for use in the street paving.     As the work progressed the planks were removed from the forms and piled at the side of the street until needed for use at some other place in the concrete construction.     About 1:30 o'clock in the afternoon of August 12, 1925, the plaintiff attempted to cross Washington avenue from the easterly side to the westerly side at this point, and, as she had passed just beyond the westerly side of the street car tracks, she stepped on a nail or spike projecting through one of these planks and was injured.     The suit was brought to recover damages in consequence thereof.     At the conclusion of the plaintiff's case a verdict was directed in favor of the defendant on the

ground that there was no testimony from which it could be determined whether these planks were placed in the street as a temporary cross walk by the city employees or whether they were placed there by the employees of the street railway company as a convenience for passengers getting off and on the street cars.

At the point where the accident occurred the concrete foundation for the pavement had been put in either August 10th or August 11th, not more than 48 hours before the plaintiff was injured. The plank on which she was walking was placed on the cement after it had been partially cured or hardened. Therefore, considering the inconspicuous character of the alleged defect, *i. e.,* the nail in the plank, it is evident that there was not a sufficient lapse of time after the plank was laid in the street to cause the city to be charged with constructive notice of the unsafe condition. *Corey* v. *City of Ann Arbor,* 134 Mich. 376; *McGrail* v. *City of Kalamazoo,* 94 Mich. 52; 43 C. J. p. 1048, and cases noted. There was no proof that the defendant had actual notice of a defective condition of the cross walk. There could be no recovery for damages caused by an unsafe condition of a cross walk except the city had actual or constructive notice of the condition. *Burleson* v. *Village of Reading,* 110 Mich. 512.

But the plaintiff claims the right to recover on the theory that the city used improper material in constructing the cross walk. It must be conceded here, as it was in the circuit court, that planks with nails or spikes protruding up through them would not be proper materials with which to construct a cross walk. On the theory of use of improper materials in constructing the cross walk, it was incumbent upon the plaintiff to establish the fact that the defendant or some of its agents or employees did so use this plank

in the construction of a cross walk, rather than that this plank along with the others was placed in the street by the employees of the street railway company as a means of getting passengers across the newly laid cement. A careful review of the record convinces us that the circuit judge was correct in holding that there was no proof on this issue to sustain the plaintiff's claim. The city engineer, who had charge of this work, was called for cross-examination by the plaintiff; and he was the only witness who gave testimony of probative value on this phase of the case. In part he testified:

"We had considerable difficulty because people would get off street cars and sometimes step into the soft concrete. We notified the street car company to instruct their motormen to stop their cars beyond the soft concrete. I do not know whether those plank were ever used temporarily while not being in the form or for any other purpose by my workmen; they may have been for all I know. * * *

"Q. They may have been used by your workmen, may they not, for the purpose of providing a place for pedestrians to walk, so they would not step down in crossing the street on your soft concrete, is that right?

"A. Might have been. I do not know whether they were placed there by our men or not. * * *

"Q. I thought you said you knew of your men using planks for that very purpose in other places?

"A. No, I did not mean to say that, if I did. I do not think I did say that.

"Q. Do you know anything about how those planks came to be laid down there from the street car track to the westerly curb of Washington avenue on this day in question?

"A. No, I don't understand that they were, and I don't know who put them there.

"Q. Those were planks belonging to the city of Lansing were they not?

"A. I don't know that. The street car company were also doing some work on the streets.

"*Q.* Nobody got any permission from you to put the planks there, did they?

"*A.* No. No one got any permission from me or our workmen that I know of. * * * If there was no landing place on either side, no place for people to get on or off the street car at the corner, they built up out of old ties or out of new ties in some cases, a sort of landing place where people could get off or on the street car. .

"*Q.* That was all the street cars would do to aid the pedestrians getting in and from the cars?

"*A.* I do not know as that was all. They were interested of course in getting their people out of the car.

"*Q.* Did you give anybody any authority to use those planks other than the city workmen?

"*A.* No, sir. We tried to keep pedestrians off entirely. We do not put up plank and lay the ends out on the green concrete for people to walk on. I have no knowledge or recollection with reference to any plank being placed at this intersection of Ionia street at any time as has been testified to here only what I have heard after that. I did not have at the time of the accident, I never had seen any plank there that was used for the traffic before the accident." ·

A patrolman from the Lansing police department whose regular beat covered the location on Washington avenue where the accident occurred was called as a witness for the plaintiff. He testified: "I do not know whether they (the planks) were put there by the city or by the street car company." Both the city and street railway company had men working on this street at the time. It is as reasonable to assume that the planks were placed in the street by the employees of one as by those of the other. Even if we assume this plank on which the accident occurred belonged to the city, the record would not justify the conclusion that it was placed in the street by an agent or employee of the city rather than by an agent or employee of the street railway company. The temporary convenience was constructed partly of rail-

road ties belonging to the railway company and partly of planks, which presumably belonged to the city; but who placed them in the street for public use is not disclosed by any testimony in the record. A verdict by a jury would have been a mere conjecture. The trial judge correctly directed a verdict.

The judgment entered is affirmed, with costs to the appellee.

FEAD, C. J., and FELLOWS, WIEST, CLARK, McDONALD, POTTER, and SHARPE, JJ., concurred.